*** Filed ***
10:49 PM, 21 Jun, 2026
U.S.D.C. Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**AMENDED COMPLAINT**

25-Civ.-7014

**JURY TRIAL DEMANDED**

MICHAEL EISENBERG, Plaintiff, -against- NEW YORK CITY DEPARTMENT OF EDUCATION; ANASTASIA COLEMAN, Special Commissioner of Investigation for the New York City School District, in her official capacity; LAURA HEMANS BRANTLEY, Executive Director of the Office of Equal Opportunity & Diversity Management, in her official capacity; HUBERT GUSCOTT, Director of Medical, Leaves & Records, in his official capacity; LISA HYMAN; Deputy Director of Medical, Leaves, and Records Administration of the New York City Department of Education, in her official capacity; DR. HOA TU, Superintendent Queens North High Schools, in her official capacity; ANTHONY STIFFLER, ESQ., Executive Director Queens North High Schools, in his official capacity; NAMITA DWARKA, Deputy Superintendent Queens South & former Principal of William Cullen Bryant High School, in her official and individual capacity; CARLYN ST. AUBAIN, Principal of William Cullen Bryant High School, in her official and individual capacity; ALLISSA MASON, Assistant Principal of William Cullen Bryant High School, in her official and individual capacity; JONATHAN YOUNG, Assistant Principal of William Cullen Bryant High School, in his official and individual capacity; KAITLIN RIVERA, Former Assistant Principal of William Cullen Bryant High School, in her official and individual capacity; MOISES MORALES,

Assistant Principal of William Cullen Bryant High School, in his official and individual capacity; JOHANNA HENRY, Assistant Principal of William Cullen Bryant High School, in her official and individual capacity; YAZITZA ROBINSON, Assistant Principal of William Cullen Bryant High School, in her official and individual capacity; Defendants.

Plaintiff MICHAEL EISENBERG, Plaintiff *Pro Se*, as and for his Complaint, against

Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

1. This action seeks monetary and equitable relief based upon Defendants' deliberate and continuous discriminatory and retaliatory conduct against Plaintiff, Michael Eisenberg. This Complaint arises from new operative facts—including specific, independent, and discrete adverse employment actions—that occurred on or after December 11, 2024 (the date the last claims were submitted in the prior action, *Eisenberg v. NYC DOE et al.*, 24-CV-1661 ("*Eisenberg I*")).

2. Plaintiff was not permitted to amend or add new claims or evidence to *Eisenberg I* following the Court's Orders of July 18, 2025, and January 2, 2026. Consequently, this action is based on new rights and discrete injuries acquired subsequent to the last available date for amendment in the prior litigation and is not barred by res judicata or the rule against duplicative litigation.

3. Claims include violations of the Age Discrimination in Employment Act ("ADEA"), the New York State and City Human Rights Laws ("NYSHRL"/"NYCHRL"), and 42 U.S.C.

§ 1983 for retaliation against Plaintiff's First Amendment protected speech and violations of the Equal Protection Clause, as well as Title VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972. As detailed herein, the New York City Department of Education (NYCDOE) is liable pursuant to *Monell v. Department of Social Services* for its unconstitutional policies and customs.

4. Adverse employment actions, occurring after July 18, 2025, include the initiation of an Special Commissioner of Investigation for the New York City School District ("SCI") investigation against Plaintiff on August 15, 2025; the attachment to Plaintiff and national publication of a "problem code" on August 15, 2025; the public, police-escorted reassignment and constructive termination of Plaintiff on September 2, 2025; the denial of Plaintiff's sabbatical on December 9, 2025; and subsequent pay, professional opportunity, and grievance denials.

5. The conduct complained of involves Defendants' coercion, retaliation, and interference with Plaintiff's exercise of his First Amendment rights, as well as favorable treatment exhibited towards similarly situated younger music teachers at William Cullen Bryant High School ("the School").

6. This action also includes claims for Intentional Infliction of Emotional Distress ("IIED"), Libel per se, Slander per se, and Conspiracy to Commit Fraud.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as this matter involves federal questions.

8. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

9. This action's venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

**PARTIES**

10. Plaintiff Michael Eisenberg is a resident of Queens County and the State of New York. He was born in 1966 and is 59 years old.

11. At all times relevant herein, Defendant New York City Department of Education was a city school district established pursuant to Title II, Article-52-A of the New York State Education Law, NY Educ. Law Section 2590 et seq.

12. At all times relevant herein, Defendant Anastasia Coleman was the Special Commissioner of Investigation for the New York City School District (SCI), exercising supervising authority of all SCI investigations, within the New York City Department of Education, and is sued in her official capacity.

13. At all times relevant herein, Defendant Laura Hemans Brantley was the Executive Director of the Office of Equal Opportunity & Diversity Management ("OEO"), within the New York City Department of Education, and is sued in her official capacity.

14. At all times relevant herein, Defendant Hubert Guscott was the Director of Medical, Leaves & Records, within the New York City Department of Education, and is sued in his official capacity.

15. At all times relevant herein, Defendant Lisa Hyman was Deputy Director of Medical, Leaves, and Records Administration, within the New York City Department of Education, and is sued in her official capacity.

16. At all times relevant herein, Defendant Hoa Tu was the Superintendent of Queens North High Schools, exercising supervisory authority over William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in her official capacity.

17. At all times relevant herein, Defendant Anthony Stiffler was the Executive Director of Queens North High Schools, exercising supervisory authority over William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in his official capacity.

18. At times relevant herein, Defendant Namita Dwarka was the Deputy Superintendent of Queens South High Schools, additionally exercising supervisory authority over Bryant High School administration and staff, within the New York City Department of Education, and is sued in her official and individual capacity.

19. At all times relevant herein, Defendant Carlyn St. Aubain was the Principal of William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in her official and individual capacity.

20. At all times relevant herein, Defendant Allissa Mason was Assistant Principal of William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in her official and individual capacity.

21. At all times relevant herein, Defendant Jonathan Young was Assistant Principal of William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in his official and individual capacity.

22. At all times relevant herein, Defendant Kaitlin Rivera was Assistant Principal of William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in her official and individual capacity.

23. At times relevant herein, Defendant Moises Morales was Assistant Principal at William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in his official and individual capacity.

24. At all times relevant herein, Defendant Johanna Henry was Assistant Principal of William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in her official and individual capacity.

25. At all times relevant herein, Defendant Yazitza Robinson was Assistant Principal of William Cullen Bryant High School, a high school in Queens, within the New York City Department of Education, and is sued in her official and individual capacity.

**PROCEDURAL HISTORY**

26.  Following the serving on Defendants of a Notice of Claim on December 16, 2022, and Plaintiff's filing of a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging age and disability discrimination, on May 10, 2023 (520-2023-01461), the EEOC issued Plaintiff a right to sue letter.

27. On March 5, 2024, Plaintiff commenced an employment discrimination action against the New York City Department of Education (NYCDOE) and other named Defendants in the United States District Court for the Eastern District of New York, *Eisenberg v. NYC DOE et al.*, 24-CV-1661 ("*Eisenberg I*"), alleging violations of federal and state law.

28. Granted Court leave, Plaintiff filed an amended complaint on January 16, 2025, based on claims that concluded with the draft submitted for approval to the Court on December 11, 2024.

29. On or about April 7, 2025, Plaintiff served a new Notice of Claim upon Defendants for new adverse actions allegedly occurring after the Court's approval of the amended complaint in *Eisenberg I*.

30. On July 18, 2025, the Court issued an Order dismissing the federal claims in *Eisenberg I* with prejudice for failure to state a claim.

31. On August 15, 2025, Plaintiff filed a Motion to Vacate the Order of Dismissal with Prejudice and to Alter or Amend the Judgment, citing newly discovered evidence withheld during discovery.

32. On September 19, 2025, Plaintiff filed a new EEOC charge (#520-2025-07254), specifically covering the new adverse actions and fresh nucleus of retaliatory conduct occurring after the filing of *Eisenberg I*, for which a Right to Sue notice was issued.

33. On December 18, 2025, Plaintiff filed the instant complaint, *Eisenberg v. NYC DOE et al.*, 25-CV-7014.

34. On January 2, 2026, the Court issued a further Order regarding procedural matters. Plaintiff was not permitted to amend or add new claims or evidence to *Eisenberg I* following the Court's Orders of July 18, 2025, and January 2, 2026.

35. On February 2, 2026, Plaintiff filed a Notice of Appeal regarding the decisions in *Eisenberg I*, which remains pending before the United States Court of Appeals for the Second Circuit.

36. On May 22, 2026, the Court interpreted Plaintiff's request to reserve the right to amend as a request to amend and ordered Plaintiff to amend by June 5, 2026.

37. On May 27, 2026, the Court granted Plaintiff's request for an extension to amend till June 19, 2026.

## STATEMENT OF FACTS

38. Michael Eisenberg has been an appointed NYCDOE music teacher since 2011, and holds a Ph.D. and two Master's degrees.

39. Despite Plaintiff's superior qualifications, seniority, and longer 15-year tenure than his remaining music department counterparts Garrett Lanzet (under 40), Alex Somer (under

40), and George Weisman (40) (collectively "Comparators"), he holds a similar role and responsibilities to Comparators.

40. In addition to holding identical certifications and qualifications for this role to Comparators, Plaintiff possesses superior salary step, alongside holding stronger performance reviews, and a clean disciplinary record *prior* to his protected whistleblowing against the School and the NYCDOE beginning in 2017 and until the present.

41. Plaintiff was appointed at the School in September 2017.

42. From the onset of his employment at the School, Plaintiff was given less per-session, comp-time, summer school, mentoring/modeling, and liaison-role compensation opportunities than his younger and junior Comparators (i.e. junior in seniority, tenure, licenses, certifications, academic qualifications, and teaching experience).

43. This inequity in apportionment of per-session compensation opportunities described above stands in violation of Chancellor's Regulation C-175 and Article 7H.

44. Although this salary and compensation disparity continued to escalate in proportion to Plaintiff's age through the present, in 2025–2026, such compensation disparity was escalated at a still higher rate, whereby he was denied all additional compensation and equal salary compensation, in accordance with mandated contractual rates.

45. Comparators were not denied such additional compensation in 2025–2026, and were granted additional unadvertised salary differentials in 2025–2026.

46. As a music teacher, younger age is not a bona fide occupational qualification; therefore, given the aforementioned, Plaintiff is similarly situated in all material respects under the ADEA.

47. Comparators have not engaged in free-speech protected activity and whistleblowing.

48. Comparators lack disciplinary records, and have not been subjected to investigations or reassignments.

49. From 2017–2026, Plaintiff has repeatedly been denied access to per-session, comp-time, summer school, mentoring/modeling, and liaison-role compensation opportunities, which Comparators have received yearly, despite his contractual entitlement to preference in these per-session opportunities, based on superior tenure and seniority to Comparators.

50. Plaintiff has also been excluded from per-session opportunity rotation.

51. Disparate allocation of per-session opportunities is also in violation of the contractual obligation to rotate per-session opportunities, course placements, and preferences pursuant to Chancellor's Regulation C-175 and Article 7H.

52. Per-session opportunities at the School are disguised under generic arbitrary designations, names, and hours to allocate with bias in violation of Chancellor's Regulation C-175 and Article 7H.

53. Beginning in November 2017 and continuing through the present, Plaintiff engaged in protected whistleblowing by reporting contractual violations, grade-fixing practices, and discriminatory harassment of educators over age 40 and/or with disabilities to NYCDOE

administration, the United Federation of Teachers ("UFT"), and external public reporting venues.

54. Following these reports described above, Plaintiff was subjected to a series of over 20 discrete investigations by the SCI, the OEO, and the Office of Special Investigations ("OSI").

55. These investigations were protracted without compelling basis or warrant, in violation of contract including Article 21C.

56. In these investigations, Defendants initiated administrative inquiries on a pretextual basis, leveraging unsubstantiated, misconstrued, exaggerated, or tenuous allegations to bypass established procedural safeguards, rather than as a mechanism for impartial fact-finding.

57. In these investigations noted above, evidence including videos was not preserved; contractually-prescribed timelines for investigation were not followed; and Plaintiff was not informed of such investigations, in violation of contract including Article 21C.

58. All these aforementioned allegations and investigations were determined unsubstantiated.

**Financial Loss Analysis and Projections of Damages**

59. Concurrently, and continuing from January 2018 to the present, Defendants systematically diverted per-session, overtime, and professional assignments to Comparators to the exclusion of Plaintiff.

60. This compensation inequity exacerbated the existing age-discriminatory disparity originating in September 2017; whereas Plaintiff formerly received nominal per-session

compensation, by the 2025–2026 academic year, he was categorically denied *all* such supplemental opportunities.

61. Furthermore, despite Plaintiff's superior tenure—a four-year gap—his 2025 base salary was only marginally higher than Weisman ($1,380), Somer ($3,779), and Lanzet ($6,174), thereby establishing an artificial compression of Plaintiff's compensation relative to Comparators.

62. Subsequent to Plaintiff's engaging in protected free-speech activities in Spring 2025, the NYCDOE and individual Defendants accelerated a policy of paying significantly greater per-session compensation to Comparators Lanzet, Somer, and Weisman than to Plaintiff.

63. The total annual financial injury to Plaintiff is $24,364 (i.e.Tier 4 with 15 years service), where the $24,364 loss reduces the 3-year Final Average Salary (FAS) by approx. $8,121, leading to a pension loss of approx. $2,030 per year (over a 25-year retirement period).

64. The projected accumulated damages are as follows:
   - 2-Year Projection: $48,728 total loss.
   - 3-Year Projection: $73,092 total loss.
   - 5-Year Projection: $121,820 total loss.

   - 10 Years of Retirement: Loss of approximately $336,369
   - 20 Years of Retirement: Loss of approximately $999,033
   - 30 Years of Retirement: Loss of approximately $2,301,771

65. The loss of $24,364 in annual income also severely impairs Plaintiff's ability to fund maximum voluntary contributions to his 457 deferred compensation and tax-deferred annuity ("TDA") retirement plans and eliminates the potential for compounded investment growth at the guaranteed 7% rate.

66. On July 2, 2025, Plaintiff learned that from January 10, 2024 onward, although Plaintiff received no tutoring and per-session assignments he applied to, Comparators had applied for and were assigned these selfsame opportunities.

67. During tax year 2025, Plaintiff sought transparent reporting of these compensation figures via Freedom of Information Law ("FOIL") inquiries, union grievances, and requests in discovery, as required by NYS Labor Law § 194, NYC Int. 982, and NYC Local Law 134-A, but was denied.

**<u>Non-Disclosure & Sham Investigations Occurring Prior to December 11, 2024</u>**

68.  From 2018 through 2026, Defendants willfully withheld investigatory records, contradicting their multiple FOIL denials to Plaintiff regarding the existence of responsive items.

69. Following the Court's January 2, 2026 Order, after numerous denials of the identical request, a FOIL production on that date finally yielded a closed April 2022 investigative report—previously cited by Defendants in *Eisenberg I* as the basis for Plaintiff's 2022–2023 reassignment.

70. In a similar false denial, SCI investigator Michael Bisogna denied the existence in FOIL responses of allegations against him and other named SCI investigators, despite his having actual knowledge of at least six such complaints, reported in public records against Bisogna himself.

71. This described conduct in responding to and denying FOIL requests demonstrates a systematic attempt by the NYCDOE, SCI, OSI, OEO, and the New York City Law Department to suppress exculpatory evidence and obstruct discovery.

72. On June 17, 2019, Defendant Dwarka falsified Plaintiff's signing of a required disclosure document to Plaintiff of a May 15, 2019 allegation of pushing, grabbing, and verbal abuse and the resulting OSI (19-06521X) investigation.

73. Defendants Mason and Morales acted to conceal this non-disclosure from Plaintiff by withholding this documentation, despite their contractual duty otherwise.

74. Defendants and the OSI never disclosed this investigation or allegation to Plaintiff in violation of contract and Chancellor's Regulation 830. (Noticed to Plaintiff in a FOIL in January 2026.)

75. On or around February 2, 2022, Defendants Dwarka, Mason, and Guidance Counselor Trisha Ramcharran discussed a plan together to allege sexual harassment against Plaintiff, using Mason's agent Mason's secretary Laura Feliz to falsely corroborate the allegation.

76.  On or around February 2, 2022, enacted that plan to charge Plaintiff with sexual harassment on the same week Plaintiff had complained to Dwarka, Ramcharran, and Superintendent Tu in writing about ongoing harassment by students assigned to Ramcharran.

77. Ramcharran alleged that Plaintiff sexually harassed her by blocking the "exit" (her office door) and "ranting about an unspecified student" (the student harasser). (Noticed to Plaintiff in a FOIL in January 2026.)

78. After filing the charge, Ramcharran never returned the assigned investigator's follow-up inquiries; therefore the case was closed.

79. In Summer 2023, this closed investigation was reopened by Defendants instigation but reclosed when Ramcharran once again failed to respond to the investigator.

80. Plaintiff was never informed by the OEO or Defendants of the aforementioned allegations or investigation in violation of contract and Chancellor's Regulation 830.

81. This is *not* the adverse action reported in *Eisenberg I*, alleging that Mason and Dwarka conspired to commit fraud by falsely alleging they were sexually harassed by Plaintiff in January 2022, but rather, a totally distinct allegation and investigation.

82. On April 12, 2022, Defendants falsely alleged that Plaintiff sexually harassed a student by "going behind her to check her work" and opened an investigation with the OSI (22-03750X) and OEO (C-0966/22).

83. The investigation above was later recalled by the SCI on September 16, 2022 after Defendant Dwarka, with the facilitation of Defendants Mason, Young, Rivera, Tu, and Stiffler, requested SCI reinvestigate the closed case.

84. Defendants and the SCI never informed Plaintiff of this allegation or investigation in violation of contract and Chancellor's Regulation 830. (Noticed to Plaintiff in a FOIL on January 2, 2026.)

85. This is a different, unrelated investigation from the investigation leading to Plaintiff's reassignment from October 6, 2022 to May 30, 2023.

86. On June 27, 2023, hours after Plaintiff reported the identities of the two students who he alleged had sexually harassed him for four months, Defendant Morales filed an SCI allegation of his being sexually harassed by Plaintiff.

87. Defendants subsequently opened an investigation against Plaintiff for moving his chair "threateningly close" to Morales when Plaintiff was reporting the harasser identities to Morales.

88. Plaintiff was never informed of this investigation by Defendants and the SCI in violation of contract and Chancellor's Regulation 830. (Noticed to Plaintiff on July 2, 2025.)

89. On June 27, 2023, Plaintiff complained to the Attendance Secretary Mimi Diakos about the wrongful depletion of his sick bank days and its adverse impact on his migraine treatment.

90. On June 27, 2023, Diakos, with the assistance of St. Aubain, Morales, and Mason, filed an allegation of sexual harassment when Plaintiff "moved his chair threateningly close to her." (Noticed to Plaintiff on July 2, 2025.)

91. On July 29, 2024, with the support, facilitation, and knowledge of all named Defendants, Assistant Principal Valerie Winberry alleged that Plaintiff was in violation of his sabbatical stipulations, despite her full knowledge that he was in complete compliance.

92. The NYCDOE possessed a clear incentive to reward Winberry for her efforts to secure Plaintiff's termination, as Plaintiff has been a persistent and public critic of systemic

misconduct within the NYCDOE—specifically widespread grade fixing and age discrimination—practices that Plaintiff alleged, in public statements, are not only tacitly permitted but proactively sanctioned by the NYCDOE.

93. Motivated by personal animus and a desire to curry favor with NYCDOE administration to advance her career—specifically, to obtain a promotion to Deputy Administrator of the Public Schools Athletic League (PSAL)—Winberry sought to effectuate Plaintiff's termination by initiating an investigation through the SCI predicated on allegations Winberry knew to be false. (Noticed to Plaintiff on July 2, 2025.)

94. On September 18, 2024, Defendant Young and Defendant Rivera, supported by Defendants St. Aubain, Ho, and Stiffler, commenced a discrimination and retaliation SCI and OEO (Case C-182924) investigation against Plaintiff when he complained on the same day to Young and Rivera that the treatment of teachers at the School was unlawful, discriminatory, and violated contract.

95. In the September 18, 2024 meeting in question, Plaintiff informed Young and Rivera that this mistreatment of teachers was expressly the reason for his union activity, media whistleblowing, and lawsuit against the School.

96. Defendants, the SCI, and the OEO intentionally protracted these aforementioned investigations with animus for three months seeking grounds to dismiss Plaintiff under a "sham" pretext of investigating.

97. Furthermore, Plaintiff was never informed of this ongoing action. (Noticed to Plaintiff on July 2, 2025.)

**Unknown "Sham" Investigations Occurring Subsequent to December 11, 2024**

98. On or around April 1 2025, Defendant Mason, with the support and facilitation of all Defendants sought to commence a new investigation of sexual misconduct with a minor against Plaintiff, based on allegations anonymously reported by Mason, Defendants, and their agents. (Noticed to Plaintiff on July 2, 2025.)

99. On April 14, 2025, Defendants Young, Mason, and St. Aubain, with the oversight of Defendants Tu and Stiffler, opened an additional new discrete investigation of Plaintiff misconduct with a minor. (Noticed to Plaintiff in a FOIL on May 26, 2026.)

100. Upon information and belief, Defendants continue to wilfully withhold investigatory records of additional investigations of Plaintiff by Defendants, in bad faith outside the scope of employment, an evidentiary deficiency that would be relieved through discovery.

**Documented Physical and Neurological Impairment Resulting from Defendants' Unremitting Campaign of Harassment**

101. Beginning on or around April 9, 2025, Plaintiff began to suffer from severe, recurring intestinal and abdominal issues that he had never experienced prior to this period.

102. Beginning on April 9, 2025, Plaintiff reported this gastrointestinal condition to Defendant Young, stating that he believed it was derived from Defendants' ongoing harassment.

103. Plaintiff's gastrointestinal condition required medical intervention, commencing in May 2025, under the care of gastroenterologist Dr. David Sosnowik.

104. On July 28, 2025, Plaintiff underwent an endoscopy due to his increasingly exacerbated gastrointestinal condition.

105. On August 13–14, 2025, Plaintiff experienced excessive vomiting, with more than 50 episodes within a 24-hour period, necessitating emergency hospitalization in São Paulo, Brazil, for acute dehydration.

106. These gastrointestinal symptoms continue to the present intermittently.

107. In January 2026, Plaintiff's treating neurologist, Dr. Jiy-haur Lu, escalated Plaintiff's migraine treatment from Ajovy to Qulipta (atogepant)—a significantly more costly daily oral medication.

108. The exorbitant cost of this escalated daily dosage, which followed the also-costly monthly Ajovy injection, led to a prescription refusal by the DOE prescription plan, causing Plaintiff further financial dilemma and acute anxiety.

109. Defendants have knowledge of Plaintiff's migraine condition.

110. Plaintiff has written repeatedly to Defendants about this worsening neurological condition, alleging its exacerbation to be a result of Defendants' unremitting campaign of intimidation and retaliation.

### Additional Harassment and Adverse Actions in Spring/Summer 2025

111. On or around April 25, 2025 through June 6, 2025, Plaintiff received notice through emails from the School Purchase Secretary of unlawful repurposing of budgetary Studio

Arts funding allocations by the NYCDOE designated expressly for Plaintiff by Defendants and specifically Henry.

112. On or about May 2025, Plaintiff reported these misallocations to the UFT and Defendants.

113. Such misallocation of funds designated for Plaintiff for the benefit of his students constitutes a "rogue" act outside the scope of employment.

114. In this misallocation of Plaintiff's funds, Henry acted with retaliatory animus in response to Plaintiff's complaints of Henry's public ridicule of him and his complaints of her obstruction of his requests for accommodations and equitable per-session allocation.

115. On June 12, 2025, after Plaintiff fell on a water spill reported a half hour previously to Defendants, Robinson removed him from class and sequestered him alone in a closed room without a union representative, past school hours, without pay, against his will.

116. Robinson falsely asserted to Plaintiff a new mandatory policy requiring Plaintiff to remain until medical aid arrived.

117. Robinson refused to provide witness statements or video of the accident or to process Line of Duty Injury (LODI) paperwork, resulting in non-payment of medical bills.

**Conclusion of *Eisenberg I***

118. On June 21, 2025 through July 19, 2025, Plaintiff traveled to Taiwan on a Fulbright-Hays grant with severely restricted accessibility.

119.    On July 2, 2025, following the lapse of the April 17, 2025 deadline, Defendants provided a critically deficient partial discovery production. This document dump consisted of unlabeled, disorganized, and duplicative files—including hundreds of unresponsive or blank items—packaged in an inaccessible zip format requiring substantial electronic resources to download.

120.    Defendants knew such electronic resources were unavailable to Plaintiff on the field in Taiwan because he notified them expressly.

121.    This production lacked a prolific quantity of requested documents including all Bryant Google drive materials.

122.    (Defendants' agent Juan Velez had been instructed by Defendants to destroy the Bryant drive materials, and did, on or around May 30, 2023 (Plaintiff's own materials), and on or around September 15, 2023 (all remaining materials on the drive)).

123.    Both acts of spoliation by Defendants' agent Velez occurred after Defendants, the SCI, OEO, and OSI received Plaintiff's notices of anti-spoliation duty and EEOC claim.

124.    On July 15, 2025, Defendants revoked Plaintiff's access to these July 2, 2025 discovery files, obstructing any meaningful review of evidentiary materials, despite Defendants' notice that Plaintiff (1) was overseas from June 21, 2025–July 18, 2025 and (2) lacked electronic access to the enormous files.

**Post-*Eisenberg I*: Protected Speech & Advocacy on Matters of Public Concern**

125. On February 24, 2025, Plaintiff complained in writing to Defendants, UFT, and NYCDOE senior management regarding Title IX sexual harassment violations by the School.

126. Beginning in Spring 2025, Plaintiff began speaking out regarding unfair teacher evaluation policies and practices, advising teachers including, but not limited to Teacher J, regarding contractual and legal rights and measures of recourse against Defendants.

127. In Spring 2025, Plaintiff advised Teacher W about her legal rights regarding age discrimination and retaliation against her by the School.

128. On June 11, 2025, Plaintiff complained in writing to Defendants, UFT, and the NYCDOE senior management regarding contractual violations as to job assignment transparency at the School prejudicing all teachers.

129. On July 13, 2025, Plaintiff complained in writing to Defendants and the UFT, about: Unfair denial of Line of Duty Injury benefits; Misreporting of Plaintiff's attendance and depletion of his Cumulative Absence Reserve time ("CAR") sick days; Denial of release of Plaintiff's accident video, and the subsequent spoliation; False imprisonment of Plaintiff by Robinson; and Plaintiff's payment out-of-pocket medical expenses.

130. On July 13, 2025, Plaintiff asserted to Defendants a violation of Title IX on the basis of his sex and a pattern followed whereby Defendants failed to (1) preserve pertinent video and material evidence; (2) interview witnesses timely who would have provided

exculpatory evidence clearing Plaintiff; (3) inform Plaintiff of any allegations or investigations; (4) investigate with diligence and timeliness.

131. On July 23, 2025, Plaintiff addressed a cease and desist letter to Defendants and the UFT, reporting six newly discovered investigations initiated against him for alleged sexual misconduct and harassment (involving a minor student and School staff).

132. On July 23, 2025, Plaintiff emailed Defendants, the UFT, and the NYCDOE regarding the unawarded Cumulative Absence Reserve ("CAR") time for employee leave earned during the 2017–2025 period by all employees at the School. Plaintiff alleged this lapse in proper payment violated contractual policy, Article 15, and Chancellor's Regulations C-175, as it wrongfully deprived School employees of earned leave.

133. On August 21, 2025, Plaintiff reported ongoing harassment and retaliation by his supervisors Mason and Young to St. Aubain, Tu, Stiffler, and Deputy Superintendent Leneen Gibson; and an ongoing pattern of false investigations based on falsified allegations, often pertaining to sexual misconduct with minors by Mason and Young.

134. On August 21, 2025, Plaintiff requested removal of these supervisors and required reporting to the OEO and SCI in compliance with Title IX and contract.

135. On June 10, 2026, Plaintiff again reported ongoing harassment and retaliation by Supervisors Mason and Young to Defendants and the Title IX Office through an ongoing pattern of false investigations, based on falsified allegations, often pertaining to sexual misconduct with minors.

136. On June 10, 2026, Plaintiff renewed his request for removal of these supervisors and required reporting to the OEO and SCI in compliance with Title IX and contract.

137. Plaintiff's speaking about public matters with the NYCDOE, its agents, the UFT, press outlets (including the New York Post), and union members, among others, has continued to the present.

138. Public speech includes but is not limited to whistleblowing and advocacy in June 2025 to union members and Defendants on behalf of Teachers J & N; also assisting these teachers in identifying their rights and legal courses of action in addressing discriminatory treatment, which Teachers J & N alleged against Defendants.

139. This public-speech action culminated in a union grievance for retaliation for whistleblowing advanced on December 11, 2025 (OLR 260311 UFT Q78477 Step 2 Grievance Conference) pursuant to Article 22 of the Collective Bargaining Agreement.

140. Whistleblowing also included reporting contractual violations of Defendants to the UFT and to union members on a weekly basis from January 2025 through June 2026; and reporting to Defendants, NYCDOE upper management, et al. contractual and employment law violations regularly, including, but not confined to on 7/16/25; 7/23/25; 9/3/25; 9/8/25; 9/16/25; 2/2/26; 2/10/26; 3/9/26; 3/10/26; 3/11/26; and 3/12/26.

**Post-*Eisenberg I*: Retaliatory Conduct and Unlawful Disciplinary Pretext**

141. On July 21, 2025, all claims of violations of the First Amendment, Title IX, the ADEA, and the ADA were dismissed with prejudice for failure to state a claim in accordance with the Court's order filed July 18, 2025.

142. On August 15, 2025, the same day Plaintiff filed his Motion to Vacate, Defendants and their agents, including SCI personnel, initiated an investigation falsely alleging claims of sexual misconduct, an allegation alleged to have occurred months prior, but never filed or investigated before this date..

143. On September 2, 2025, as a direct and immediate consequence of the false allegations, Defendant Robinson publicly escorted Plaintiff from his school with a police guard in plain view of all staff at a staff breakfast attended by all staff, in a public gesture intended to humiliate, stigmatize, and vilify Plaintiff before his peers.

144. Defendants procured his reassignment to a "rubber room" (a non-teaching administrative location). This constitutes a materially adverse employment action and a constructive termination that stripped Plaintiff of all NYCDOE resources and professional opportunities.

145. This public humiliation and deprivation of compensation were direct retaliatory responses to Plaintiff's ongoing protected activity.

146. Critically, Plaintiff was never contacted about any specific allegations or the reason for this reassignment after September 2, 2025 to the date of the instant amended complaint's filing.

147. In a grievance hearing on or about January 15 2026, Defendant St. Aubain stated to Arbitrator Marcel Kshensky that the Plaintiff's reassignment was based on an allegation that he had "walked in on a room with girls changing or had been outside the room when they were changing: during Spring 2025.

148.    Furthermore, upon information and belief, the DOE has since failed to comply with anti-spoliation duties regarding video evidence pertinent to the ongoing August 15, 2025 investigation and Plaintiff's prior injury, demonstrating deliberate indifference.

149.    This action resulted in the immediate attachment of a "problem code" to his record, blacklisting him from professional opportunities and registering him with national screening agencies.

150.    Defendants failed to provide specific allegations or contractual notice, intentionally weaponizing the process to cause severe reputational and physical harm while bypassing due process requirements.

151.    On or about September 2, 2025, Defendants colluded in removing Plaintiff from the school seniority and tenure list, this only disclosed to Plaintiff on or around May 26, 2026

152.    Despite having continuing notice of this falsified record, all Defendants persisted in failing to report or rectify this error, thereby ratifying and enforcing an unlawful and anti-contractual act, intended to prejudice Plaintiff's employment rights.

153.    On December 9, 2025, Defendants denied Plaintiff's application for a sabbatical, thereby violating the NYCDOE 2023 contract, Chancellor's Regulations C-650, and Personnel Memorandum #5 2024-2025 stipulations.

154.    On the same date, other DOE candidates were approved for a sabbatical who had inferior standing, tenure, and length of employment, were aged under 40, and presented potential hardship status in a license area, unlike Plaintiff who had no such claim of hardship.

155.     Plaintiff had been denied a sabbatical on three successive previous occasions in similarly prejudicial determinations.

156.     Conversely, unlike other NYCDOE candidates who were denied a sabbatical on the same date and received a formal determination and contractual reasoning, Plaintiff received no explanation for the denial, a separate violation of the NYCDOE 2023 contract, Chancellor's Regulations C-650, and Personnel Memorandum #5 2024-2025.

157.     Defendant Hubert Guscott willfully failed to provide a timely determination on Plaintiff's timely-submitted sabbatical application from October 23, 2025, ignoring repeated follow-up inquiries in February 2026.

158.     This administrative neglect was willfully facilitated by Defendant Lisa Hyman, who engaged in obstructive conduct by demanding redundant documentation already submitted months prior.

159.     These actions by Guscott and Hyman, characterized by a failure to perform basic ministerial duties, were not merely negligent but, given the deliberate delays and the context of Plaintiff's protected activity, demonstrated a coordinated, hostile intent to impede Plaintiff's professional development and inflict professional and emotional harm.

160.     On February 18, 2026, Plaintiff complained to NYCDOE Human Resources Director Kelda Vidal, Defendants, Attendance Secretary Jahira Rodriguez, and the UFT about the non-processing of a routine employee electronic signature for verification for student loan forgiveness requested in January 2026 by Plaintiff from Defendants.

161. On April 29, 2026, Plaintiff was informed by Teacher H at the School that Defendants and Comparators but not UFT Chapter Leader Lignou had informed other employees at the School that Plaintiff was "in trouble," had been docked pay, and was facing a hearing for his misconduct at the School.

162. On May 8, 2026, after hearing from the Federal Student Aid Office ("FSA") that the routine employment verification had not been received, Plaintiff complained again, and Director of Reassignment Laurie Vazquez emailed that it would be handled by Attendance Secretary Rodriguez.

163. However, on June 17, 2026, Plaintiff received notice from the FSA that his Public Service Loan Forgiveness application had been denied and closed based on NYCDOE non-processing.

164. Despite Plaintiff's being punitively reassigned on September 2, 2025, based on an allegation from Spring of 2025 and an investigative pretext of protective urgency, SCI Investigator Charlie Arnao, assigned to the investigation of Plaintiff in August 2025, failed to make initial contact with Plaintiff until Wednesday, June 10, 2026.

165. On June 10, 2026, Arnao and an associate engaged in a targeted act of intimidation and invasion of privacy at Plaintiff's private residence.

166. After identifying themselves as investigators to the building superintendent, but refusing to produce official credentials upon request, Arnao and his colleague persistently attempted to gain unauthorized entry to Plaintiff's home, disregarding the direct opposition of building security and management.

167. Following this refusal of entry, these individuals proceeded to interrogate Plaintiff's mother—a non-party to the underlying employment dispute—thereby conducting an egregious, unwarranted intrusion into Plaintiff's domestic sphere designed solely to harass, intimidate, and inflict severe emotional distress.

168. The intentional and prolonged continuation of the SCI investigation and the September 2, 2025 reassignment were specifically calculated and designed to prevent Plaintiff from (1) pursuing any additional per session, comp time, monitoring, mentoring, summer school, or alternate teaching posts in the NYCDOE because Defendants knew the continued attachment of a problem code continued to bar him from attaining any of these employment opportunities; (2) retiring or applying for any other teaching, arts-education related, or legal employment.

169. Defendants knew that if Plaintiff vacated his position during the investigation, despite the absence of any finding of substantiation, he (a) would be automatically made subject to the revocation of his teaching license; (b) would be barred from working with children in any capacity; (c) would jeopardize his retirement and pension status; (d) would be subjected to the permanent adhesion of a problem code to his record for life, searchable and published to national and state law enforcement agencies.

170. Defendants also sought, through the protracted investigation, to prevent Plaintiff from running for the UFT Chapter Leader post, a vacancy incurred by the current chapter leader's scheduled retirement in Spring 2026.

171. Defendants knew this position was becoming vacant, and Plaintiff had expressed his aspiration to candidacy directly to Defendants.

172. This UFT leadership role would have provided Plaintiff with a greater voice and platform to express dissent against the administration's alleged unlawful policies and discriminatory contractual violation.

173. The election was held on May 11, 2026, and Plaintiff was disqualified from running as a direct result of the reassignment and unduly protracted "sham" investigation.

174. Furthermore, Defendants Dr. Hoa Tu and Anthony Stiffler, along with Deputy Superintendent Leneen Gibson and Human Resources Director Kelda Vidal, despite having actual and constructive knowledge of the systemic harassment, retaliatory investigations, and falsification of disciplinary records by Mason, Young, and St. Aubain, deliberately shirked their affirmative duty to intervene.

175. The roles of Tu, Stiffler, Gibson and Vidal as senior administrators impose a non-delegable affirmative duty to intervene, report, and rectify these actions under Chancellor's Regulation A-830.

176. All Defendants acted outside the scope of their official duties and with personal retaliatory animus by knowingly initiating, ratifying, and perpetuating baseless investigations.

177. Each individually-named Defendant willfully flouted established DOE administrative guidelines and contractual mandates by weaponizing the SCI investigation process to retaliate against Plaintiff for his protected First Amendment whistleblowing activities.

178. By actively orchestrating the spoliation of exculpatory video evidence and the dissemination of fabricated allegations, the named Defendants acted with malicious, individual intent to destroy Plaintiff's professional reputation, demonstrating that their conduct was not merely administrative but was driven by a personal, retaliatory agenda separate from any legitimate official function.

179. As per Defendants' systematic failure to adhere to internal administrative procedures (Chancellor's Regulation A-830), the NYCDOE is bound by its own internal regulations, specifically Chancellor's Regulation A-830, which establishes the mandatory framework for the "Anti-Discrimination Policy and Procedures for Filing Internal Complaints of Discrimination."

180. Defendants engaged in a systematic practice of ignoring these mandates to weaponize investigations against Plaintiff.

181. Specifically, Defendants: (a) bypassed the 60-day notice period mandated by UFT Contract Article 21.C.3; (b) initiated "sham" investigations without good-faith basis to serve as a pretext for retaliatory "problem code" attachments; and (c) failed to preserve critical exculpatory video evidence regarding Plaintiff's June 12, 2025 injury and the subsequent fabricated allegations.

182. This pattern of administrative non-compliance was not mere negligence, but a coordinated effort to obstruct due process and retaliate against Plaintiff's protected whistleblowing activity.

183. Defendants, through the SCI, led by Anastasia Coleman, and the OEO, led by Executive Director Laura Hemans Brantley, have institutionalized a pervasive custom and practice of utilizing "sham" investigations as instruments of systemic retaliation.

184. As heads of these respective offices, Defendants Coleman and Brantley are responsible for this institutionalized custom—characterized by the intentional circumvention of mandated 60-day notice periods, the systematic spoliation of exculpatory video and electronic evidence, and the indefinite attachment of "problem codes"—which constitutes a clear policy of administrative weaponization.

185. The aforementioned practice is tacitly sanctioned and promoted by the NYCDOE upper administration, which maintains a posture of deliberate indifference to the constitutional rights of employees.

186. Furthermore, Defendants Dr. Hoa Tu and Anthony Stiffler, along with Deputy Superintendent Leneen Gibson and Kelda Vidal, having actual and constructive knowledge in writing from Plaintiff and Defendants of this systemic retaliatory scheme, deliberately shirked their affirmative duty to intervene, report, and rectify these unlawful, discriminatory actions, thereby ratifying the conduct as official policy.

187. This calculated persistence of unfounded investigations constitutes a continuing violation of Plaintiff's rights, demonstrating that the retaliation is an ingrained institutional policy rather than a series of disconnected administrative errors.

188. Furthermore, all Defendants at the School had actual and constructive knowledge of the adverse actions listed above, because all Defendants at the School met daily in

administrative cabinet meetings, or or around at 9:00am on school days, and reviewed all these aforementioned actions and the developing details surrounding them.

189. Furthermore, these individually named Defendants at the School all actively participated in, enabled, and ratified the adverse actions described above.

190. Additionally, as alleged above, Defendants Guscott and Hyman engaged in deliberate administrative obstruction, willfully impeding Plaintiff's professional development through bad-faith delays and demands for redundant documentation.

191. These actions constituted a failure to perform basic ministerial duties, demonstrating a coordinated, hostile intent to inflict professional harm outside of the scope of employment, and furthermore, a willful shirking of their affirmative duties; in so doing, they have effectively ratified retaliatory harassment as official departmental policy.

192. Defendants engaged in a persistent pattern of obstructing FOIL requests initiated as early as 2018 and continuing to the present.

193. Partial disclosures on October 2, 2025, January 7, 2026, and May 22, 2026, revealed multiple previously withheld adverse actions and unidentified investigations, including one dating to April 14, 2025.

194. Defendants have permanently jaundiced and endangered Plaintiff's record, reputation, and educational and legal future career trajectory, by exposing him to prejudice, based on fraudulent allegations and investigations, intentionally false reviews, and defamation of character.

195. Hereinafter, Plaintiff must report these allegations and investigations in all employment situations and prospective professional interactions with minors, despite their being "sham" allegations and investigations, all found unsubstantiated, thus irrevocably impairing his record throughout his professional future; jeopardizing and coloring his character as it pertains to the ethics of these fields.

196. Additionally, this has caused irreparable harm to Plaintiff in general professional, academic, social, and church circles, incurring embarrassment, humiliation, and denial of other opportunities.

197. Thus Defendants have severely undermined and weakened Plaintiff's earning potential and career prospects, personal and professional reputation, and general standing within the community with this outrageous intentional retaliation and discriminatory conduct.

198. Plaintiff's repeated protestations of unfair evaluations were a matter of public interest voiced on behalf of teachers at the School and citywide, in an effort to hold administration to a standard of integrity.

199. Plaintiff alleges that the School intentionally engages in a policy and practice of penalizing teachers with low ratings, using these adverse ratings to compel teachers to fix grades so Principal and administrative ratings and graduation rates may be registered as higher than they actually are citywide and nationwide.

200. Plaintiff alleges that such a policy and practice fraudulently boosts NYCDOE ratings at large nationwide, and has served as an incentive for NYCDOE's continued support and

non-intervention in the described bad actions, specifically due to Plaintiff's vociferous confrontation and public vocal speech, in opposition to this fraudulent practice of specious grade and rating boosting.

**FIRST CLAIM FOR RELIEF**

**(Violation of 42 U.S.C. Section 1983 and Monell Liability)**

**(First Amendment Retaliation against All Defendants and NYCDOE)**

201.  Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

202.   Defendants violated 42 U.S.C. § 1983 by retaliating against Plaintiff for protected First Amendment speech on matters of public concern.

203.   Plaintiff was speaking as a citizen, and the speech was a substantial or motivating factor in the adverse employment actions taken by individual Defendants—including the August 15, 2025 SCI investigation and problem code attachment, the September 2, 2025 public removal, and the December 9, 2025 sabbatical denial—which were taken in direct temporal proximity or immediately following Plaintiff's protected activities, such as the filing of the Motion to Vacate on August 15, 2025, providing a strong inference of retaliatory motive.

204.  Plaintiff engaged in protected First Amendment speech by filing union grievances and whistleblowing against school administration concerning matters of public concern.

205.   This speech was made outside of Plaintiff's official duties and through public channels, including to the UFT, NYCDOE upper administration, and press outlets.

206. This conduct includes, but is not limited to, reporting on: contractual violations (including job assignments and Cumulative Absence Reserve time); grade fixing, fraudulent social promotion, and retaliation against teachers for non-compliance; age and disability discrimination; Title IX sexual harassment violations; unfair teacher evaluation policies; and the unlawful repurposing of budgetary funds.

207. **Monell Claim:** Defendant NYCDOE, the municipal entity, is liable for these constitutional violations pursuant to *Monell v. Department of Social Services*.

208. The adverse actions and constitutional injuries were caused by an unconstitutional policy or pervasive custom of the NYCDOE, specifically: (1) the centralized, automated placement of "problem codes" in the NYCDOE and DCJS databases upon the mere initiation of an investigation, bypassing due process; (2) a pervasive practice of failing to adhere to the 60-day notice period mandated by Article 21.C.3 of the UFT Contract; and (3) a systematic failure to preserve exculpatory evidence (specifically video footage) in investigations involving employees who have previously engaged in protected First Amendment activity.

209. This policy is evidenced by the NYCDOE's systematic disregard for its own mandatory investigative procedures (Chancellor's Regulation A-830), including the failure to adhere to notice requirements and the failure to preserve exculpatory evidence.

210. This failure constitutes a pervasive custom of deliberate indifference, demonstrating that the NYCDOE condones and facilitates the weaponization of investigations against protected speakers.

211. Defendants Tu and Stiffler, along with Leneen Gibson and Kelda Vidal, are individually liable for this failure to intervene, as they possessed both supervisory authority and actual notice of the ongoing misconduct, yet actively chose to ignore their non-delegable obligations to uphold the Department's own administrative policies and contractual protections.

212. The failure of Defendants Dr. Hoa Tu and Anthony Stiffler, and supervisors Leneen Gibson and Kelda Vidal, to intervene and report these substantiated patterns of abuse further solidifies this liability, as their deliberate inaction confirms a systemic culture where discriminatory and retaliatory practices are permitted to flourish with impunity.

213. The NYCDOE's liability is predicated on an unconstitutional custom and policy of weaponizing SCI investigations as a mechanism for constructive termination of outspoken employees.

214. This custom is evidenced by: (1) the centralized, automated placement of "problem codes" in the NYCDOE and DCJS databases upon the mere initiation of an investigation, bypassing due process; (2) a pervasive practice of failing to adhere to the 60-day notice period mandated by Article 21.C.3 of the UFT Contract; and (3) a systematic failure to preserve exculpatory evidence (specifically video footage) in investigations involving employees who have previously engaged in protected First Amendment activity; (4) an official policy and custom of initiating "sham" SCI investigations and failing to adhere to contractual and constitutional notice periods (including the 60-day rule) for serious allegations, particularly against employees engaged in protected speech: (5) a pervasive custom of deliberate indifference, including the alleged spoliation of evidence, against

employees who report misconduct, which rises to the level of official governmental policy.

215. As a proximate result of Defendants' retaliatory actions against him, Plaintiff has suffered and continue to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Violation of the ADEA)

### (Discrimination, Retaliation, and Hostile Work Environment against NYCDOE)

216. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

217. Plaintiff is over 40 years of age and thus protected by the ADEA.

218. Age was the but-for cause of the adverse employment actions suffered by Plaintiff. Plaintiff has been treated differently than his similarly situated, younger counterparts (Lanzet, Somer, Weisman) by receiving inferior pay, compensation, and per-session opportunities, specifically the denial of $24,364 in annual income, despite his superior tenure and qualifications.

219. This disparate treatment, coupled with the continuous pattern of investigations and discipline not faced by younger comparators, gives rise to a plausible inference of discrimination.

220. The systematic nature of the adverse actions, specifically the denial of per-session work and sabbatical opportunities, is not merely coincidental but reflects a pervasive custom of targeting older educators to reduce payroll obligations.

221. By preferentially funneling supplemental pay and professional opportunities to substantially younger comparators (Lanzet, Somer, and Weisman) despite their lower tenure and inferior qualifications, the NYCDOE has demonstrated a consistent and actionable pattern of age-based disparate treatment.

222. The Department's use of unsubstantiated, pretextual investigations as a tool to disqualify older employees from these opportunities further establishes that age was the "but-for" cause of the adverse employment actions taken against Plaintiff.

223. Furthermore, the NYCDOE maintains a policy and custom of condoning and facilitating the weaponization of investigations as a tool for age discrimination.

224. By initiating pretextual investigations against employees aged 40 and older, the Department seeks to terminate these employees to cut costs, specifically targeting those with higher salaries due to their longer service, thereby replacing experienced personnel with younger, lower-salaried staff.

225. As a proximate result of Defendants' discriminatory actions against Plaintiff, he has suffered and continue to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**(Violation of the New York State Human Rights Law)**

**(Discrimination, Retaliation, and Hostile Work Environment on the Basis of Age against All Defendants)**

226.   Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

227.   Plaintiff is over forty years of age and thus protected by the NYSHRL.

228.   Plaintiff has been treated less well than his similarly situated, younger counterparts at the School by receiving inferior pay, compensation, and per-session opportunities, specifically the denial of $24,364 in annual income, and by being subjected to a continuous pattern of retaliatory fraudulent investigations and adverse actions, which were not experienced by his younger colleagues.

229.   Plaintiff has at all times performed his duties satisfactorily and in a similar fashion to his younger counterparts.

230.   Specifically, he has received disciplinary letters to file, less-than-effective observation reports, and been the subject of a number of investigations. These documents have been issued pervasively and continuously for the past several years.

231.   Plaintiff has at all times performed his duties satisfactorily and in a similar fashion to his younger counterparts.

232.   Defendants' conduct created a hostile work environment characterized by pervasive and severe age-based harassment and retaliation.

233. This environment was maintained through a pattern of unsubstantiated, pretextual investigations that specifically targeted older staff; the public, police-escorted removal of Plaintiff; and the continuous use of "problem codes" as a tool of intimidation.

234. This conduct was objectively offensive, was perceived as abusive by Plaintiff, and effectively altered the conditions of his employment by creating a climate of fear, humiliation, and systematic exclusion.

235. Age was a motivating factor in the adverse employment actions taken against Plaintiff. The NYCDOE, through the actions of the individual Defendants, deliberately targeted Plaintiff for disparate treatment in pay and professional opportunities because of his age and tenure, intending to reduce salary expenditures by marginalizing older, more experienced educators in favor of younger, lower-paid counterparts.

236. The individual Defendants (St. Aubain, Mason, Young, Rivera, Morales, Henry, and Robinson) participated directly in this discriminatory conduct by initiating, facilitating, and ratifying the sham investigations and the public humiliation of Plaintiff.

237. Their actions were not mere administrative oversights but were deliberate, retaliatory steps intended to force Plaintiff out of his position on account of his age.

238. As a proximate result of Defendants' discriminatory actions against him, Plaintiff has suffered and continues to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**

**(Violation of the New York City Human Rights Law)**

**(Discrimination, Retaliation, and Hostile Work Environment on the Basis of Age and Disability against All Defendants)**

239. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

240. Plaintiff is over forty years of age and thus protected by the NYCHRL.

241. Plaintiff has been treated less well than his similarly situated, younger counterparts at the School by receiving inferior pay, compensation, and per-session opportunities, specifically the denial of $24,364 in annual income, and by being subjected to a continuous pattern of retaliatory fraudulent investigations and adverse actions, which were not experienced by his younger colleagues.

242. The disparate treatment Plaintiff experienced went well beyond "petty slights and trivial inconveniences." By subjecting Plaintiff to a continuous pattern of fraudulent, retaliatory investigations and the public humiliation of a police-escorted removal, Defendants created an environment that was both hostile and discriminatory.

243. These actions were not isolated incidents but a systematic, ongoing campaign to marginalize Plaintiff because of his age and his qualifying disability.

244. Age and disability were "motivating factors" for the adverse treatment Plaintiff received. Defendants were aware of Plaintiff's medical condition and his age, yet they specifically selected Plaintiff for adverse assignments and unsubstantiated investigations

while providing younger, non-disabled comparators with preferential treatment in per-session and compensation opportunities.

245. The individual Defendants (Dwarka, St. Aubain, Mason, Young, Rivera, Morales, Henry, and Robinson) participated directly in this discriminatory conduct.

246. By initiating, facilitating, and ratifying these "sham" investigations and the public humiliation of Plaintiff, they actively engaged in the discriminatory practices prohibited by the NYCHRL.

247. Their actions were deliberate and intended to force Plaintiff out of his position due to his protected characteristics.

248. Plaintiff has at all times performed his duties satisfactorily and in a similar fashion to his younger counterparts.

249. As a proximate result of Defendants' discriminatory actions against him, Plaintiff has suffered and continues to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress against All Defendants)

250. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

251. Defendants' conduct, as detailed in the Statement of Facts, constitutes extreme and outrageous conduct that transcends the bounds of decency in a civilized community.

252. By fabricating sexual misconduct allegations and orchestrating a public removal, Defendants intentionally and recklessly caused Plaintiff severe emotional distress and documented physical injury.

253. Defendants breached their duty to act with integrity, proximately causing the damages described herein.

254. The Defendants' conduct was not merely a series of administrative disputes or employment disagreements; it was a targeted, systematic campaign of psychological terror. Specifically, the Defendants' repeated fabrication of allegations of sexual misconduct with minors against Plaintiff constitutes conduct so extreme and outrageous as to be utterly intolerable in a civilized society.

255. Defendants knew or should have known that these specific accusations carry a uniquely devastating social and professional stigma, and that by publicizing these falsehoods and orchestrating a police-escorted removal, they were effectively dismantling Plaintiff's dignity, reputation, and emotional stability.

256. As a direct result of this extreme and outrageous conduct, Plaintiff has suffered severe and debilitating emotional and physical distress.

257. This is not limited to mere hurt feelings or ordinary work stress, but includes verifiable, clinical medical trauma.

258. This distress has manifested in severe physical illness, including a medical crisis necessitating emergency hospitalization for acute dehydration, and a documented worsening of his neurological condition requiring the escalation of migraine treatment to high-cost, daily medication.

259. The temporal link between Defendants' acts of intimidation—culminating in the June 2026 intrusion into Plaintiff's private residence by SCI investigators—and Plaintiff's physical and psychiatric decline demonstrates that Defendants' actions were the proximate cause of his severe emotional and physical harm.

260. Defendants engaged in continuous and ongoing extreme and outrageous conduct towards Plaintiff to his detriment, knowing of Plaintiff's special physical and emotional sensitivity to such conduct and wielding an inequity of power in an abuse of authority.

261. This conduct includes but is not limited to pursuing unfounded fraudulent investigations of sexual misconduct with a student and minor and sexual harassment and with supervisors, despite Plaintiff's repeated requests to Defendants to desert in such retaliatory harassment and failing to notice Plaintiff in violation of contract and his rights, thus producing migraines, emotional trauma, depression, and nightmares on and after the dates these were first discovered, namely December 6, 2024, and October 18, 2023.

262. Defendants, through extreme and outrageous conduct going beyond all bounds of decency towards Plaintiff, demonstrated an intent to cause, and reckless disregard of a substantial probability of causing, severe emotional and physical distress in the Plaintiff.

263. Defendants' conduct subjecting Plaintiff to a policy and practice of baseless investigations of sexual impropriety with minors; threatening his reputation and future career; foreseeably occasioning imprisonment or barring from educational and legal sectors; went beyond all possible bounds of decency to be regarded as atrocious, utterly intolerable in a civilized society.

264. The extreme and outrageous conduct of Defendants towards Plaintiff directly caused him severe emotional distress, severe physical pain, bodily harm, and mental trauma.

265. By virtue of the above, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with migraine treatment, mental health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, anxiety, emotional pain and suffering, impairment of future health and career, and other economic or non-economic damages.

266. As the injury was caused willfully, wantonly, and with actual and common law malice, Plaintiff is entitled to punitive damages in an amount to be determined by a court.

### SIXTH CLAIM FOR RELIEF
### (Libel per se Against All Defendants)

267. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

268. On or about August 15, 2025, Defendants falsely, maliciously, and without privilege authored, published, and maintained permanent written statements and administrative "problem codes" on inter-agency tracking systems accusing Plaintiff of professional

misconduct, specifically stating the false allegation that Plaintiff was "entering a room with girls changing or being outside" when it occurred.

269. This statement constitutes libel per se because it unambiguously accuses Plaintiff of sexual misconduct and professional unfitness, which is inherently injurious to him in his capacity as an educator.

270. Defendants published these defamatory statements with actual malice, ill-will, and a reckless disregard for the truth. Defendants knew the allegations were fabricated, yet intentionally persisted in maintaining the "problem code."

271. Defendants published these statements to third parties by entering them into the central "no hire" database of the New York City Department of Education, with the explicit knowledge that said information would automatically populate and republish to external state and national screening networks, including the New York State Division of Criminal Justice Services (DCJS) and the Federal Bureau of Investigation (FBI) database registry.

272. Furthermore, this is a continuing tort for which Defendants are responsible: the defamatory statement is reiterated and republished on every occasion the "problem code" is accessed by DOE employees, supervisors, or external recipients.

273. To date, this code has been made available to over 100 supervisors to whom Plaintiff applied for professional opportunities, causing a continuous and systemic destruction of his professional reputation.

274. Defendants intentionally bypassed the 60-day contractual notice requirement mandated by UFT Contract, Article 21.C.3. By deliberately failing to provide notice, Defendants denied Plaintiff any opportunity to contest the false allegations before they were codified and disseminated, further demonstrating their bad-faith intent to sabotage his career.

275. As a proximate result of Defendants' libelous conduct, Plaintiff has been severely injured in his professional standing, reputation, and career trajectory.

276. Plaintiff has suffered the loss of per-session, compensatory, and summer school opportunities, and continues to suffer extreme emotional distress and mental anguish. Defendants' actions were willful, wanton, and malicious, warranting an award of punitive damages.

**SEVENTH CLAIM FOR RELIEF**

**(Defamation/ Slander per se Against All Defendants)**

277. .Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

278. On or about and between August 15, 2025, and May 29, 2026, Defendants, including, but not limited to Defendants St. Aubain, Morales, Mason, and Young, along with Comparators acting at their direction, knowingly, maliciously, and without privilege uttered false and defamatory oral statements regarding Plaintiff's employment and professional standing to third parties, including other employees, school staff, and specifically "Teacher H."

279. The defamatory oral statements falsely stated, in sum and substance, that Plaintiff was "in trouble," "had been docked pay," and was actively "facing a hearing for [his] conduct."

280. The aforementioned oral statements are entirely false and fraudulent.

281. At no time had Plaintiff been legally docked pay or subjected to a valid disciplinary hearing for the underlying fabricated allegations, which Defendants knew to be a pretextual, "sham" investigation.

282. Defendants made and published these oral statements with actual malice, common-law ill-will, and a reckless disregard for the truth.

283. Defendants spoke these words with the deliberate intent to humiliate Plaintiff, destroy his professional relationships, poison his immediate work environment, and blacken his reputation in direct retaliation for Plaintiff exercising his protected legal rights.

284. The defamatory oral publications constitute slander *per se* because they directly touch upon and attack Plaintiff's professional integrity, competence, and fitness to practice his trade as an educator, thereby legally rendering the statements injurious on their face without requiring pleading or proof of special damages.

285. As a direct and proximate result of Defendants' slanderous utterances, Plaintiff has suffered, and continues to suffer, severe emotional distress, deep humiliation among his professional peers, and substantial economic damages resulting from his total exclusion from the school community and professional advancement opportunities.

**EIGHTH CLAIM FOR RELIEF**

**(Violation of Title IX: Discriminatory Sham Investigation and Deliberate Indifference against NYCDOE)**

286. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

287. The School is a Title IX funding recipient.

288. Plaintiff is an "appropriate person" who had actual knowledge of the false sham investigations undertaken by Defendants against Plaintiff, conducted without rigor or appropriate care because of Plaintiff's sex.

289. The NYCDOE subjected Plaintiff to a "sham" investigation into alleged sexual misconduct, giving rise to a plausible inference of gender-based bias in disciplinary proceedings.

290. The NYCDOE demonstrated deliberate indifference by failing to act on its actual knowledge of the harassment and retaliation (gained through Plaintiff's prior emails and cease and desist letters of July 2025), specifically by failing to follow procedural safeguards, failing to investigate properly, and exercising exclusive and substantial control over evidence (including video footage) and the reporting platform to Plaintiff's prejudice.

291. This deliberate indifference exacerbated the gender-based bias in the disciplinary proceedings.

292. The NYCDOE's "sham" investigation process exhibited clear gender-based bias.

293. By failing to disclose specific allegations, ignoring exculpatory evidence, and failing to provide the required contractual notice, the NYCDOE created a "guilty until proven innocent" standard that was enforced against Plaintiff specifically because of his gender.

294. The School and the Office of the Superintendent had actual knowledge of this harassment.

295. Defendants could have taken corrective measures to investigate acts, identify fraud and frivolous retaliatory acts, and take prophylactic steps to ensure Plaintiff's safety and non-bias in the investigations to ensure Plaintiff was not prejudiced against based on sex and did not.

296. The School acted deliberately and recklessly not taking appropriate measures to address acts of bias against Plaintiff in the "sham" investigation process.

297. The School declined to investigate, report timely, or take appropriate protective measures regarding Plaintiff's safety and future exposure to additional acts of prejudice and retaliation.

298. The discrimination was severe, pervasive, and objectively offensive to Plaintiff by causing severe emotional and physical distress; exposing him to schoolwide censure in the continuance, escalation, and promulgation of acts of harassment with impunity; interfering with his efforts to quell further harassment.

299. As a result of the reckless deliberate indifference, failure to investigate properly without bias or take corrective measures, and as a result of the retaliation engaged in to

repudiate Plaintiff, he was greatly injured in his character and reputation, suffered abuse and harassment, as well as great pain and mental anguish.

300. Defendants are liable to Plaintiff for actual and compensatory damages, damages for injury to his professional reputation, emotional distress, lost wages, and future gains and profits from which Plaintiff is barred as a result of this conduct.

301. As a result of the above, Plaintiff has been damaged in an amount to be determined by a court. As injury was caused willfully, wantonly, and with actual and common law malice, Plaintiff is entitled to punitive damages in an amount to be determined by a court.

## NINTH CLAIM FOR RELIEF

### (Violation of Title VII of the Civil Rights Act of 1964)

### (Discrimination, Retaliation, and Hostile Work Environment on the Basis of Sex against NYCDOE)

302. Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

303. Defendant New York City Department of Education is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

304. Plaintiff is a member of a protected class (sex) and at all relevant times performed his duties satisfactorily.

305. Plaintiff was subjected to discrimination, a hostile work environment, and adverse employment actions by Defendant NYCDOE on the basis of his sex and in retaliation for his opposition to unlawful employment practices.

306. This includes, but is not limited to, being subjected to a continuous pattern of baseless and fraudulent investigations into sexual misconduct and harassment, resulting in the attachment of a permanent "problem code" to his file, public removal from his teaching duties, and constructive termination.

307. The conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment, and it was conducted by Defendant NYCDOE's supervisors, managers, and/or agents with deliberate indifference.

308. This conduct includes the continuous pattern of baseless investigations, the attachment of the permanent "problem code," the loss of $24,364 in annual income, the public, police-escorted removal from teaching duties, and the constructive termination.

309. The adverse employment actions described herein, specifically the August 15, 2025, initiation of the SCI investigation and subsequent reassignment, followed the Plaintiff's protected complaints regarding his July 23, 2025, cease and desist letter in such close temporal proximity as to raise a strong inference of retaliatory motive.

310. As a proximate result of Defendant NYCDOE's discriminatory and retaliatory actions against him, Plaintiff has suffered and continues to suffer a loss of monetary damages, humiliation, severe emotional distress, mental and physical anguish and suffering, and damage to his professional reputation and potential loss of employment, in an amount to be determined at trial.

**TENTH CLAIM FOR RELIEF**

**(Conspiracy to Commit Fraud against All Defendants)**

1. Plaintiff repeats and realleges all the preceding paragraphs of this complaint, as if fully set forth herein.

2. Defendants entered into an agreement and common plan to defraud Plaintiff and the NYCDOE by intentionally fabricating allegations of misconduct, sexual harassment, and professional impropriety.

3. The Defendants engaged in overt acts in furtherance of this conspiracy, including, but not limited to:

   a. Coordinating to falsely report Plaintiff for sexual harassment, as evidenced by the February 2022 plan involving Defendants Dwarka, Mason, and Ramcharran;

   b. Falsifying disciplinary records and investigative reports;

   c. Systematically withholding exculpatory evidence and suppressing FOIL requests to conceal the fraudulent nature of the investigations; and

   d. Attaching "problem codes" to Plaintiff's permanent employment record based on these known-false allegations.

4. Defendants knew these allegations were false and fabricated and shared a common objective to orchestrate Plaintiff's termination, secure his blacklisting, and sabotage his career.

5. Defendants' coordinated actions constituted a "fraud on the institution" of the NYCDOE, as they used their positions to inject false information into official government databases, thereby subverting the integrity of the Department's own disciplinary and record-keeping functions.

6. As a direct and proximate result of this conspiracy, Plaintiff has suffered significant reputational damage, the permanent loss of employment opportunities, severe emotional distress, and ongoing financial injury.

## JURY DEMAND

Plaintiff demands a trial by a jury on all of the triable issues of this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for declaratory relief and damages as follows:

A. A declaratory judgment that Defendants' post-July 18, 2025 conduct violated 42 U.S.C. § 1983, the ADEA, Title VII, Title IX, and New York State and City Human Rights Laws;

B. A declaratory judgment that Defendants are in violation of Title VII & Title IX.

C. A declaratory judgment that Defendants are liable for Intentional Infliction of Emotional Distress.

D. A declaratory judgment that Defendants are liable for Libel per se and Slander per se.

E. A declaratory judgment that Defendants are liable for Conspiracy to Commit Fraud.

F. Awarding Plaintiff compensatory damages (including but not limited to emotional distress damages) and punitive damages (to the extent available) pursuant to the 42 U.S.C. § 1983, the ADEA, and New York State and City Human Rights Laws;

G. Awarding Plaintiff reasonable attorneys' fees, costs, and disbursements; and

H. Such other and further relief as to this Court may deem necessary, just and proper.

Dated: Bayside, New York

June 19, 2026

By: _____

Michael Eisenberg
Plaintiff Pro Se
23-50 Waters Edge Dr. Apt. 6L
Bayside, NY 11360
mjeisenberg@gmail.com
(516) 395-7644